UNITED STATES DISTRICT COURT          SOUTHERN DISTRICT OF TEXAS

GENO CAPOLETTI WILSON,                §
                                      §
                    Petitioner,       §
                                      §
versus                                §          CIVIL ACTION H-03-3324
                                      §
DOUGLAS DRETKE,                       §
                                      §
                    Respondent.       §

Opinion on Denial of Habeas Corpus

Geno Capoletti Wilson seeks to have this court overturn his conviction for murder. It will not.

1.      *Introduction.*

In December of 1998, Wilson drove a car with his brother and his friends–Cornelius Watts and Randy Mims–inside. They stopped at an apartment complex to speak with an acquaintance, Marilyn Lemon, and her two friends, Joshua White and a woman only identified as Keysa. The group started smoking marijuana. They retreated to an alley between two buildings when a police cruiser drove past.

James "Richie" White was selling shoe cleaning products in the neighborhood that day. He approached the group and tried to make a sale. White cleaned Wilson's shoes to demonstrate his product. Wilson agreed to buy some cleaner. White left to find a pen so that Wilson could sign a contract. While White was gone, Wilson apparently told the others that he wanted to rob White. When White returned, Wilson pulled out a pistol, held it to the back of White's head, and moved him farther into the alley. Some members of the group left the area, but they still heard Wilson speaking loudly. White said he had no money. Wilson fired a single bullet into White's brain.

Wilson ran to the car and climbed inside.  The car sped away.  White died the next day from the gunshot wound.  Witnesses quickly identified Wilson as the shooter.  White was nineteen years old, and Wilson was seventeen.

Wilson was convicted of capital murder and sentenced to death.  After availing himself of state appellate and habeas remedies, Wilson now seeks a federal writ of habeas corpus.  This court stayed Wilson's federal proceedings in anticipation of a pending Supreme Court case challenging the execution of those who commit their crimes while still a minor.  Under the invisible "evolving standards of decency" clause the Supreme Court discovered that the federal Constitution prohibits the execution of those, like Wilson, who killed before age eighteen.  *Roper v. Simmons*, 543 U.S. 551 (2005).  The state of Texas has commuted Wilson's sentence to life imprisonment.  Accordingly, issues raised by Wilson's federal petition that attack his punishment phase are now moot.  Two potential grounds for relief remain: (1) counsel was constitutionally ineffective; and (2) Texas's concurrent habeas and direct appeal proceedings in capital cases is not the process that is due under the Constitution.

The state courts rejected all Wilson's complaints.  Respondent now seeks summary judgment.

2.    *Legal standards*

The writ of habeas corpus is an exceptional writ.  Since before the Constitution in 1789, the writ has protected individuals from wrongful punishment.  The writ allows individuals to challenge their criminal convictions on the grounds that their conviction and

sentence violate federal law.  The writ gives the federal courts limited power to reconsider a state's trial and appellate processes.

Under the law, this court cannot grant federal relief unless (1) the state court's legal conclusions conflict with or unreasonably apply clearly established federal law, or (2) a material factual decision of the state court is unreasonable in light of the evidence.  *See* 28 U.S.C. § 2254(d)(1) and (2); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000).  State court findings subsist unless a petitioner rebuts them with clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1).  A petitioner must ultimately show that his conviction or sentence violates the national Constitution or federal law.  *See* 28 U.S.C. § 2254(a).

3.     *Assistance of Counsel*.

Wilson raises complaints about his attorneys' representation at trial and on appeal. Wilson alleges that trial counsel did not inform him of a possible plea offer.  Wilson faults trial counsel for not calling two witnesses who allegedly would have testified that, immediately after the murder, Wilson said that he did not intentionally shoot White.  Wilson also faults trial counsel for not seeking a limiting instruction about testimony that suggested that he committed other crimes.  Wilson criticizes appellate counsel for not raising several issues on direct review.

Wilson asserts that his attorneys at trial and on appeal were ineffective to the point that he was denied the help of a lawyer, which would offend the United States Constitution. The law applies two separate standards in evaluating an attorney's representation.  Wilson argues that, because the attorney he hired–E.J. Van Buren–was no help before trial, this court

must presume prejudice. The complete denial of counsel, when an attorney "entirely fails to subject the prosecution's case to meaningful adversarial testing," requires a court to presume that his representation prejudiced the defense. *United States v. Cronic*, 466 U.S. 648, 659-660 (1984). Courts use this constructive denial of counsel standard sparingly and only when counsel's representation amounts to no representation. *See Haynes v. Cain*, 298 F.3d 375, 381 (5th Cir.), *cert. denied*, 537 U.S. 1072 (2002); *Gochicoa v. Johnson*, 238 F.3d 278, 284 (5th Cir. 2000). Most often, a prisoner must prove both a deficiency in counsel's performance and resulting prejudice. *See Strickland v. Washington*, 466 U.S. 668 (1984).

The police arrested Wilson on December 3, 1998. The trial court appointed two different lawyers before Wilson hired Van Buren on April 13, 1999. Van Buren had never tried a capital case before. Wilson's petition raises several complaints about Van Buren's representation, including allegations that Van Buren's drug use hampered his ability to represent Wilson, that he rarely communicated with Wilson, and that he did little in his behalf.

One week before jury selection began, Van Buren apparently informed the trial court that he was not competent to handle Wilson's case. The trial court then appointed two more attorneys, Steven Greenlee and Connie Williams, to try the case, but left Van Buren as third-chair counsel. The trial began on November 8, 1999. Wilson argues that Van Buren's deficient representation, and the other attorneys' late appointment, amounted to no representation at all.

Wilson fails to recognize that Greenlee and Williams were no strangers to Wilson's defense before their appointment. Within a few weeks of being hired by Wilson, Van Buren

contacted Greenlee and asked for his assistance.  Williams also became associated with the case well before trial.  Greenlee, not Van Buren, went to hearings and prepared Wilson's defense.  When the trial court appointed Greenlee and Wilson, their experience with the case and readiness to proceed made them not request a continuance.  Whatever deficiencies Van Buren may have manifested in his personal life and representation, Wilson has not shown that Greenlee and Williams's efforts fell so short of constitutional expectations to presume prejudice.

Van Buren was not some hack that the callous state of Texas dumped on him. Wilson selected him from a huge pool and hired him.  Wilson hired him to replace two lawyers the state had appointed him.

Van Buren was candid with the court and reported that he did not feel competent to continue representing someone in a capital case.  That does not build a defect into Wilson's trial; that is how lawyers and courts are supposed to function.  Wilson bears the consequences of his choices.

This Court, therefore, will review whether Wilson has shown (a) deficient representation and (b) actual prejudice with respect to his five attorneys' efforts.

A.      Failure to convey a plea offer

Wilson says that Van Buren "failed to convey a plea-bargain offer of 40 years to him." (Docket Entry # 11).  Wilson argues that, had counsel told him about the offer, he would have pleaded guilty.  Fatal defects doom Wilson's claim.  The record does not conclusively show that the prosecution made an offer or that Van Buren knew about it if they did.  Van Buren submitted an affidavit stating that he had no knowledge of an offer.  The

lead prosecutor at Wilson's trial submitted an affidavit that stated he "never made an offer

of any kind, including one for the defendant to plead to forty years in the penitentiary in this

case." The only support for Wilson's claim that the prosecution made a plea offer comes

from one of his appointed attorneys. Greenlee said in an affidavit that

> [a]t some point as the case was pending the prosecutor asked me if Mr.
> Wilson would consider a plea bargain of 40 years. I talked to Mr. Wilson
> about this and he was obviously reluctant to accept any offer without talking
> to Mr. Van Buren. He would not accept the 40-year offer at that time and I
> urged him to speak with Mr. Van Buren about it.

Van Buren's detachment from the case hampered his ability to help Wilson fairly consider

the plea offer.

The state habeas court specifically rejected Wilson's claim that trial counsel failed

to inform him of a plea deal. Based on the prosecutor's credible affidavit, the state habeas

court found that "the State made no plea bargain offers to [Wilson], specifically, the State

did not offer [Wilson] a forty-year sentence in exchange for [his] pleading guilty to the

offense of capital murder, and that [he] was never willing to plead guilt." State Habeas

Record at 316. On that basis, the state habeas court concluded that "the State made [no]

offers that were not conveyed to [Wilson]; thus, [he] fails to show deficient performance,

much less harm, based on such habeas contentions." State Habeas Record at 329.

Under the limited of the habeas-corpus review of state factual findings, this Court

presumes that the State made no plea offer unless Wilson shows otherwise by clear and

convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Other than relying on the affidavit

Greenlee prepared in state habeas court, Wilson makes no showing, much less a clear and

convincing one, that the prosecution was ready take the death penalty off the table in exchange for a plea.

Even if the prosecution's oblique inquiry were considered an explicit offer, Greenlee conveyed that information to Wilson. Wilson cannot complain that Van Buren failed to tell him about a plea offer when Greenlee had already told him about it. Van Buren apparently knew nothing about that offer and thus could not discuss it with Wilson. The state habeas court's determination that Van Buren did not hurt Wilson by not communicating a plea deal is this court's finding.

B.     Failure to present an accident defense

Witnesses heard Wilson threaten and start to rob White before hearing a gunshot. Witnesses saw Wilson then run and get into the backseat of a car that sped away. At trial, counsel attempted a weak, and obviously unsuccessful, misidentification defense. Wilson argues that trial counsel instead should have called two witnesses who would have testified that Wilson expressed deep remorse immediately after the offense because the gun went off accidentally.

Wilson bases this claim on two affidavits from people to whom he demonstrated remorse. Cornelius Watts, who was in the car when Wilson shot White, said

> I was present at the apartments the day the boy was shot. Geno was up all night, smoking fry, the night before the incident. I was in the car so I did not see the incident. When Geno got back in the car after the boy was shot, I asked Geno why he did it. Geno told me "the gun went off by mistake."
>
> I went to a lawyer's office with Tony Wilson, Eleanor Miller, and Randy Mims, to discuss the shooting of the boy. The man did not ask me about anything Geno said after the shooting. The man tried to get me to say I was standing outside the car and the incident went down differently than it did.

- 7 -

> The man did not ask me any questions about Geno's background, family, drug use, or day to day life.
>
> I was arrested and brought to the Courthouse during Geno's trial.  I would have testified that Geno said the gun went off by mistake if I had been asked.

State Habeas Record at 164-65.  Jason Jerome Kennard (who testified at the punishment phase under the name Jason Jerome Wilson) also said in an affidavit that Wilson showed non-intent and remorse:

> Geno came over and met me at [Cornelius Watts'] house right after the boy was killed.  Geno was alone in burgundy car.  Geno asked me to get in the car he was driving.  When we got in the car, Geno started crying and shaking all over.  Geno told me that they were going to jack the boy that got shot.  [Watts] was supposed to get in the car and get ready to drive.  Geno said he went up to the guy with [the] gun.  Geno held the gun on the guy.  Geno said he looked around to see where everyone else was.  Geno said the boy moved a little bit, Geno jerked and the gun went off.  Geno said it was an accident.  Geno was crying and shaking the whole time he was telling me. . . . Geno's lawyers or investigators never visited me.  I would have gladly talked to them.

State Habeas Record at 167.

The state habeas court considered significant evidence that cut against Wilson's claim that he expressed remorse.  Watts gave the police a statement after the murder that gave no hint that the gun accidentally discharged.  Kennard never told anyone before trial that Wilson expressed remorse.  In fact, Kennard never told anyone before trial that he spoke with Wilson after the murder.

Trial counsel investigated possible defense strategies involving Watts and Kennard.  Greenlee hired Joe Patillo, a licenced private investigator, before trial.  Patillo interviewed Wilson, but "Wilson never admitted to [him] that he committed the offense.  He never told [Patillo] the shooting was accidental."  Wilson suggested that Patillo contact Watts, and

though Patillo "went by Mr. Watts house six to seven times," "each time [he] was told he was out of town. [Patillo] made it clear to the people [he] spoke to that [he] was attempting to help Geno Wilson and [he] left a card with [his] contact information on it each time [he] went by his home.  Mr. Watts never contacted [him]. [Patillo] attempted to locate Mr. Watts but was unsuccessful.  It was clear that he did not want to speak to [Patillo]."  Though Patillo spoke with several people close to Wilson, none of them indicated that "he said he accidentally shot the [victim] or that he showed remorse for the crime."  State Habeas Record at 273-75.

Van Buren also hired an investigator, Gilberto Orozco.  Orozco submitted an affidavit in which he explained that "[a]ll of the witnesses [he] spoke to said that Geno Wilson made statements such as 'I'm going to cap the mother fucker' and 'I'm going to rob the mother fucker.'  All of the witnesses [he] spoke to provided incriminating information against Mr. Wilson."  When Orozco spoke with Wilson, "he told [Orozco] that his brother Tony Wilson shot the [victim].  He never told [Orozco] that he accidentally shot [the victim]."  Finally, Wilson admitted to Orozco that he shot the victim but "[h]e did not say the shooting was an accident.  Mr. Wilson expressed no remorse for killing the [victim] or that the [victim] was dead."  State Habeas Record at 277-78.

The state habeas court disbelieved Wilson's claim that he accidentally shot White and displayed remorse immediately after the shooting.  The state habeas court found "unpersuasive the habeas affidavit of Cornelius Watts, which [Wilson] presents during habeas proceedings and in which Watts states that he did not see the shooting, based on the contradiction between Watts's habeas affidavit and Watts's prior statement and the evidence

presented at trial." State Habeas Record at 318. Likewise, the habeas court found Kennard's affidavit lacking in credibility "based on [Kennard's] contradictory statements, his lack of knowledge of the offense, and the absence of any efforts to inform trial counsel about [Wilson's] alleged remorse and alleged profession of lack of intent to kill." State Habeas Court at 319.

The state habeas court had a reasonable basis for questioning the habeas affidavits' credibility. The record supports the state habeas court's recognition of the inconsistencies between the habeas accounts and the evidence counsel had before trial. Watts gave different accounts to the police, at trial, and in his habeas affidavit. Importantly, Watts's new affidavit states that he never saw the shooting, when his police affidavit gave a detailed account of the shooting that matched testimony from other witnesses. The state habeas court doubted Kennard's account because, despite his contact with the prosecution and his trial testimony, he never came forward with the remorse testimony until well after trial.

Wilson could rebut the presumption of correctness that this Court must give the state habeas court's credibility determination, *see* 28 U.S.C. § 2254(e)(1), but has not done so. Since no other evidence supports Wilson's argument that did not intend to kill the victim, Wilson presents no reason to believe that any basis for an accidental death theory was available, even with complete investigation by counsel, at the time of trial. Simply, Wilson presents no credible evidence that he did not mean to shoot the victim.

This Court must assure itself that counsel's investigation was reasonable. *See Wiggins v. Smith*, 539 U.S. 510, 523 (2003). Even if Wilson proved that Watts and Kennard's new affidavits are credible, Wilson has not shown that trial counsel's preparation

in this regard fell below constitutional expectations.  A defendant's own statements and actions determine the reasonableness of counsel's investigation.  *See Strickland*, 466 U.S. at 691.

Wilson knew whom he had told and what he told them, yet he neglected to mention any of this to his five lawyers through trial and appeals.  Wilson gave his attorneys no reason to believe that he unintentionally shot the victim and was remorseful afterwards.  Wilson never told counsel that he accidentally pulled the trigger.  Watts and Kennard previously gave police statements that did not even hint at the information contained in their habeas affidavits.  Defense counsel tried to contact Watts to no avail.  No information suggests that Kennard told anyone about his new version of what Wilson said after the murders.  The record shows that "counsel had no reason to believe that pursuing further investigation into [the witnesses] would be useful."  *Andrews v. Collins*, 21 F.3d 612, 623 (5th Cir. 1994), *cert. denied*, 513 U.S. 1114 (1995); *see also Burger v. Kemp*, 483 U.S. 776, 795 (1987).  Wilson has not shown that Watts or Kennard would have given trial counsel the same account they gave in their habeas affidavits or that anything before trial would have caused a reasonable attorney to investigate those witnesses further.  The state habeas court's rejection of this claim was not contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

C.      Failure to seek a limiting instruction

Wilson faults trial counsel for not seeking a limiting instruction with respect to what he characterizes as three extraneous offenses introduced in the guilt phase.  First, one witness described how everyone standing in the group before the victim arrived was smoking

- 11 -

marijuana.  Second, a police officer testified that Wilson gave him a false name after his arrest.  Third, a witness's testimony suggested that Wilson drove to the scene in a stolen car. Wilson contends that trial counsel should have sought a limiting instruction with respect to these "offenses" and that the failure to do so prejudiced his defense.

When Wilson presented this argument on state habeas review, the state habeas court rejected the claim without issuing explicit fact findings.  The state habeas court, however, entered a general conclusion of law that trial counsel provided effective assistance.  That is sufficient for federal purposes unless clearly rebutted.

Respondent speculates that trial counsel did not object to the "offenses" based on strategic trial decisionmaking.  The record is silent as to why counsel did not object. Nonetheless, Wilson's argument fails to show the reasonable probability of a different result. The false name was not extraneous; it bore on his credibility and sense of guilt.  The other two were digs at Wilson that would have been better omitted, but would not have come close to changing the jury's decision.  The testimony and evidence before the jury showed that Wilson attempted to rob White, placed the barrel of his gun to his head, and then shot.  Even if the jury understood the challenged testimony to constitute extraneous offenses, nothing about the nature of those actions would necessarily influence the jury to consider Wilson's guilt differently or reasonably cause the probability of a different result.  The offenses dealt with issues tangential to White's murder.

Those "offenses" so differed in substance and magnitude from the  murder that they likely played no part in the jury's evaluation of his guilt.  Whether considered under the statutory standard or *de novo*, Wilson has not met the test of prejudice.

- 12 -

D.      Appellate counsel

Wilson raises two ineffective assistance of appellate counsel claims.  First, Wilson faults appellate counsel for not advancing the same limiting instruction claim that he raised unsuccessfully both on state habeas review and in this court.  Both this court and the state habeas court have found that underlying claim to be without merit.  There is no indication that Wilson would have fared better had he raised the claims on direct review.  As this court has found no prejudice on the underlying claim, appellate counsel did not violate the constitution by not presenting it for the first time on direct review.

Second, Wilson faults appellate counsel for not raising a claim that the trial court erred under the confrontation clause by not allowing the defense to impeach prosecution witness Randy Mims with the sentence of juvenile probation he received for misdemeanor theft.  The record is not entirely clear about whether Mims was on juvenile probation at the time of the offense, but he was not at the time of trial.  The state habeas court concluded that "[t]he trial court properly refused to allow trial counsel to impeach witness Randy Mims with his juvenile adjudication for misdemeanor theft, based on Mims's not being a suspect in the shooting of [the victim], not being the State's main witness, and not being on probation at the time of his testimony."  State Habeas Record at 334.  The state habeas court relied on *Davis v. Alaska*, 415 U.S. 308, 320 (1976), a case in which the Supreme Court balanced "the confidentiality of a juvenile offender's record" against "so vital a constitutional right as the effective cross-examination for bias of an adverse witness."  The Supreme Court held that a trial court cannot "require the petitioner to bear the full burden of vindicating the State's interest in the secrecy of juvenile criminal records."  *Davis*, 415

- 13 -

U.S. at 320.  The law does not hold "that the Constitution confers a right in every case to impeach the general credibility of a witness through cross-examination about his past delinquency adjudications or criminal convictions."  *Id.* at 321 (Stewart, J., concurring).

Subsequent cases have limited circumstances where the witness was not on juvenile probation at the time of trial, was not the key witness, and could be impeached on other grounds.  *See United States v. McGuire*, 200 F.3d 668, 678 (10th Cir. 1999); *United States v. Williams*, 963 F.2d 1337, 1341 (10th Cir 1992);  *United States v. Decker*, 543 F.2d 1102, 1105 (5th Cir. 1976); *see also* Fed. R. Evid. 609(d ) (stating that the court may admit evidence of juvenile convictions of a witness other than the accused only if such evidence "would be admissible to attack the credibility of an adult and the court is satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence").  There is no constitutional violation if the witness could otherwise be fully impeached through the use of other cross-examination.  *See United States v. Ashley*, 569 F.2d 975, 979 (5th Cir. 1978).

As noted by the state habeas court, Mims's situation differs significantly from that present in the *Davis* case.  Mims was not a crucial witness, was not then on probation, and was cross-examined on other grounds.  Mims explained how Wilson and his friends arrived at the apartment.  Mims, however, left the area before Wilson shot White.  Mims heard the gunshot but could not testify that Wilson pulled the trigger.  Trial counsel made other efforts to impeach Mims's credibility.  On cross-examination, Mims admitted to smoking marijuana with Wilson that day–an "extraneous offense" that Wilson elsewhere characterizes as highly prejudicial.  The cross-examination also suggested that the State agreed not to prosecute

- 14 -

Mims for the marijuana in return for his testimony.  Finally, trial counsel's examination of

Mims outside the jury's presence revealed that he was not on probation at the time of trial.

The state habeas court thus concluded that Wilson "offer[ed] no proof that, but for appellate

counsel's alleged errors, the results of the proceeding would have been different."  State

Habeas Record at 334.  The state habeas court reasonably found that appellate counsel was

not ineffective for not challenging Mims's limited cross-examination.


4.    *Texas's Dual Track Post-Conviction Review*.

Because Texas's capital habeas statute requires a capital defendant's direct appeal

and habeas action to proceed concurrently, Wilson complains it violated his due-process

rights.  Article 11.071, § 4(a) of the Texas Code of Criminal Procedure requires death-row

inmates to file their state habeas applications by "the 180th day after the date the convicting

court appoints counsel . . . or . . . the 45th day after the date the state's original brief is filed

on direct appeal with the court of criminal appeals, whichever date is later."  In this case,

Texas's stringent time limitations forced Wilson to file his state habeas application only days

after the Court of Criminal Appeals rejected his direct appeal and before he could petition

the Supreme Court for certiorari.  Wilson argues that Texas's expedited habeas proceedings

prevented him from attacking shortcomings in his direct appeal and generally thwarts the

adequate development of habeas claims, particularly those related to appellate counsel's

representation.

Wilson fails to raise a cognizable habeas corpus claim.  Habeas relief under 28

U.S.C. § 2254 is only available if a petitioner shows that "he is in custody in violation of the

- 15 -

Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  No Supreme Court authority has held that state habeas proceedings must run consecutive to and independent from a capital inmate's direct appeal.  In fact, States have no obligation to provide habeas relief at all.  *See Murray v. Giarratano*, 492 U.S. 1, 10 (1989) ("State collateral proceedings are not constitutionally required as an adjunct to the state criminal proceedings[.]"); *Pennsylvania v. Finley,* 481 U.S. 551, 557 (1987) ("States have no obligation to provide [a habeas] avenue of relief.").  Importantly, Wilson's challenge to Texas's method of permitting habeas review does not call into question the constitutionality of his conviction and sentence.  *See Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995) ("An attack on a state habeas proceeding does not entitle the petitioner to habeas relief in respect to his conviction, as it 'is an attack on a proceeding collateral to the detention and not the detention itself.'"), *cert. denied*, 518 U.S. 1022 (1996).  Because post-conviction proceedings are, by definition, collateral to an inmate's conviction and sentence, "infirmities in state habeas proceedings do not constitute grounds for federal habeas relief."  *Duff-Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir.1992); *see also Rudd v. Johnson*, 256 F.3d 317, 320 (5th Cir.) ("[A]n attack on the state habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself."), *cert. denied*, 534 U.S. 101 (2001).

The logical remedy to Wilson's complaint would not be voidance of his conviction and sentence but institution of procedurally adequate state habeas proceedings.  That remedy is beyond the power of the federal courts to impose.  *See Fay v. Noia*, 37 U.S. 372, 430-31 (1963) ("Habeas lies to enforce the right of personal liberty; when that right is denied and a person confined, the federal court has the power to release him. Indeed, it has no other

power[.]"); *Smith v. Lucas*, 9 F.3d 359, 366 (5th Cir. 1993) ("[T]he writ has but one remedy – to direct the liberation of a state prisoner whose confinement violates federal law."), *cert. denied*, 513 U.S. 828 (1994).  This court simply cannot consider the adequacy of Texas's chosen method of providing habeas review.

5.       *Appealability*.

Although Wilson has not yet requested a certificate of appealability, the issue of a certificate is likely to arise.  This court may deny a certificate on its own motion.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).  This court can only issue a certificate if the petitioner makes a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Supreme Court has explained the application of that standard:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.  The issue becomes somewhat more complicated where . . . the district court dismisses the petition based on procedural grounds.  We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336-37 (2003).

The law forecloses each of Wilson's claims.  The court concludes that Wilson's claims do not entitle him to a certificate of appealability.  *See* 28 U.S.C. § 2253(c).

6.     *Conclusion*.

Because Wilson received all the protection the Constitution requires, the court will deny his petition.  The court will grant respondent's motion for summary judgment.  This court will not issue a certificate of appealability.

Signed January 25, 2006, at Houston, Texas.

Lynn N. Hughes
United States District Judge